**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| **RALPH TURNER CASEY**, <br><br> **Plaintiff,** <br><br> v. <br><br> **CATHOLIC DIOCESE OF MEMPHIS** and **SACRED HEART CATHOLIC CHURCH,** <br><br> **Defendants.** | **NO. 2:24-cv-02660** <br><br> **JURY DEMAND** |

---

## COMPLAINT

---

Plaintiff Ralph Turner Casey respectfully states to the Court and Jury the following:

### PARTIES, VENUE, AND JURISDICTION

1.      This lawsuit concerns sexual exploitation of Plaintiff Ralph Turner Casey (hereinafter sometimes "Plaintiff") by Father Joel M. Wiggs (hereinafter sometimes "Wiggs"), an employee and agent of the Diocese of Memphis (hereinafter sometimes the "Diocese") and Sacred Heart Catholic Church (hereinafter sometimes "Sacred Heart"), in or around 1979 to 1983, when Plaintiff was a child. Plaintiff alleges herein that the Diocese of Memphis's and Sacred Heart's tortious acts and omissions proximately caused severe emotional harm to Plaintiff.

2.      Plaintiff is a 56-year-old resident of the State of Louisiana.

3.      At the time of the events described in this Complaint, Plaintiff was a minor.

4.      Defendant Catholic Diocese of Memphis is a religious corporation with its principal offices located at 5825 Shelby Oaks Drive, Memphis, Tennessee 38134.

5.      Defendant Sacred Heart Catholic Church is a religious organization located at 2887 East Main Street, Humboldt, TN 38343.

6.      As used herein, the terms "the Diocese" and "diocesan" should be understood as including and referring to Defendant Catholic Diocese of Memphis.

7.      At all relevant times, the Diocese and Sacred Heart each has, among other activities, hired and supervised employees, including Wiggs, and owned and managed land, parishes, schools, and other affiliated entities in Tennessee.

8.      At all relevant times, the Diocese and Sacred Heart each was responsible for promulgating employment and personnel policies and procedures binding upon employees like Wiggs, including policies and procedures that are ostensibly meant to safeguard the well-being of children with whom diocesan employees come into contact, including Plaintiff.

9.      The Diocese can be served via its religious leader, Bishop David P. Talley, and the diocesan attorney, L. Gino Marchetti, Jr., among others.

10.      Sacred Heart can be served via its religious leader and pastor, Reverend Father Mauricio Abeldano.

11.      Wiggs, who sexually assaulted Plaintiff, died on June 6, 2001.

12.      Venue in the United States District Court for the Western District of Tennessee is proper pursuant to 28 U.S.C.A. § 1391, as both Defendants, Catholic Diocese of Memphis and Sacred Heart Catholic Church, maintain their principal offices in counties within the jurisdiction of the Western District of Tennessee.

13.      This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332, as it arises from negligent acts and omissions committed by the Defendants in Tennessee and is between a nonresident Plaintiff.

## STATEMENT OF FACTS AND ALLEGATIONS

**A.      Wiggs's history in the Diocese and Sacred Heart**

14.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

15.     The Diocese ordained Wiggs as a priest in 1949.

16.     At all relevant times, the Diocese employed Wiggs and had the right to control the location and nature of his employment, including the right to restrict and revoke his faculties to provide ministry as a priest in the Roman Catholic Church.

17.     From 1949 through his retirement, the Diocese employed Wiggs as a priest in a variety of settings within the Diocese, where he had the occasion to come into frequent contact with children as part of his ministry.

18.     From 1967 to 1995, Sacred Heart employed Wiggs as a priest and provided him with opportunities to come into frequent contact with children.

19.     Wiggs would use these frequent opportunities involving contact with children to get naked with boys in a hot tub, massage them with baby oil, show them pornographic movies, sexually touch them, anally penetrate them, and engage in other sexually abusive misconduct.

20.     At all times relevant, Sacred Heart was acting as an agent and servant of the Diocese.

**B.      Wiggs's sexual exploitation of Plaintiff**

21.      From 1979 to 1983, as part of his position with the Diocese of Memphis and at Sacred Heart, Wiggs spread the gospel and did outreach in the community.

22.     Plaintiff was not raised Catholic, yet Wiggs was a frequent fixture around Plaintiff and his family. Besides for an appearance every Christmas Eve, Wiggs was a constant visitor to Plaintiff's grandparents' home.

23.     Consistent with the expectation of the Diocese and Sacred Heart that their priests would serve as honorable representatives of the Church within the community at large, Wiggs served

as a mentor and advisor to Plaintiff. He provided spiritual guidance and other life advice to Plaintiff.

24.     When Plaintiff was in 5th or 6th grade and 10 or 11 years old, Wiggs started to invite Plaintiff on outings that would include other boys around his age.

25.     Soon after, Wiggs started to invite and take Plaintiff and other boys to do other activities in small groups. When Plaintiff was about eleven, Wiggs started taking him to Kentucky Lake to spend the night.

26.     At the lake, Plaintiff would stay in a motel room with two beds and a bathroom. Plaintiff and other boys would water-ski during the day.

27.     Wiggs would encourage Plaintiff and the other boys to drop their shorts while water-skiing.

28.     Wiggs would also encourage Plaintiff and the other boys he took on trips to bathe in the river nude.

29.     Around the same time, Wiggs would start taking groups of boys out to Jackson, Tennessee for dinner and to play racquetball. At the racquetball club, there was a jacuzzi and showers. Wiggs made a point to tell Plaintiff that "men" showered naked and himself got into the jacuzzi nude, so that is exactly what Plaintiff did as well. Plaintiff was too young to realize that Wiggs was enjoying seeing him nude.

30.     One day, when Plaintiff was in around 5th grade, Wiggs asked if Plaintiff wanted to come over to his home, which was the rectory at Sacred Heart, and spend the night.

31.     Plaintiff and his parents acquiesced because they all believed Wiggs to be an honorable authority figure who deserved their respect and deference, and did not believe that a representative of the Diocese and Sacred Heart would do anything untoward.

32.     At the first sleepover, Plaintiff slept in a separate room from Wiggs and nothing untoward happened the first time.

33.     Over the course of the following (approximately) three years, Plaintiff attended many more sleepovers at the Sacred Heart rectory at Wiggs's invitation. The sleepovers started occurring on a weekly basis. Early on, Plaintiff began sleeping in Wiggs's bedroom. Wiggs would perform back rubs on Plaintiff, which would turn into nude massages.

34.     Wiggs would pour baby oil all over Plaintiff. Then, Wiggs would get on top of Plaintiff and very aggressively rub the baby oil all over him.

35.     Wiggs would also show Plaintiff pornography and/or explicit erotic films like *Last Tango in Paris* and *Lady Chatterley's Lover*.

36.     At some point in the period of time when Plaintiff was attending sleepovers, Wiggs started anally penetrating Plaintiff with his fingers. Wiggs would also have Plaintiff shower with him.

37.     The abuse Plaintiff endured at the hands of Wiggs occurred at least once a week for about three years.

38.     On or shortly after October 17, 2023, after the publication of an article in which Plaintiff discussed his own abuse at the hands of Wiggs, multiple other people contacted Plaintiff to inform him about other survivors of abuse by Wiggs, including one person who was aware that the abuse had been reported to the Diocese of Memphis.

39.     Before October 17, 2023, Plaintiff had no way of knowing that Wiggs was a recurring problem within the Diocese of Memphis and Sacred Heart, rather than a man who had solely abused Plaintiff.

40.     Before October 17, 2023, Plaintiff had no way of knowing that the Diocese of Memphis and Sacred Heart knew or should have known that Wiggs posed a threat to children.

41.     At the time that Plaintiff was abused by Wiggs, Plaintiff and/or his family were unaware of the Diocese's knowledge of Wiggs's sexual interest in young boys. In fact, Plaintiff and/or his family were misled by the Diocese and Sacred Heart with regard to their knowledge of Wiggs's

history and propensity for committing sexual abuse upon minors.

42.     After learning about Wiggs's abuse of minors, the Diocese and Sacred Heart actively took steps to protect Wiggs, conceal their own wrongdoing in supervising (or failing to supervise) Wiggs, and prevent survivors of abuse by Wiggs from filing civil lawsuits.

43.     It is the practice of the Roman Catholic Church in general, and the Diocese of Memphis in particular, through its cardinals, bishops, priests and other officials and agents, to conceal instances of child sexual abuse and complaints by victims. Dioceses zealously maintain the secrecy of the horrifying truth of rampant child sexual abuse by, among other things:

   a. Failing to disclose complaints to law enforcement officials, parishioners and the public;

   b. Maintaining secret archives and files of evidence of sex abuse, accessible only to the bishops;

   c. Instructing Church officials in destruction of incriminating documents and spoliation of evidence regarding sexual abuse by clergy;

   d. Transferring sex offending clergy to Church facilities in other locations where their pasts would not be known to parishioners, and the abusers would have a "fresh start" with a new group of vulnerable children;

   e. Threatening and coercing victims and their families to withdraw complaints and retract allegations of sexual abuse;

   f. Paying "hush money" to victims and their families, in exchange for promises of non-disclosure and confidentiality.

44.     It is similarly the practice of Roman Catholic Church parishes in general, and Sacred Heart in particular, through its officials, agents, servants, and employees, to conceal instances of child sexual abuse and complaints by survivors. Parishes turn a blind eye to abuse that takes place on their own property, such as the abuse of Plaintiff which went on for years at the Sacred Heart rectory,

which, upon information and belief, has a staffed office. Parishes actively collaborate with dioceses in the activities described in the previous paragraph.

45.     Wiggs's conduct, enabled by the negligent or intentional conduct of the Diocese and Sacred Heart, as further described herein, caused Plaintiff to suffer severe and lasting damages, including emotional harm, mental anguish, severe depression, stress-induced chronic illness arising from the abuse, PTSD, violent and intrusive thoughts, nightmares, flashbacks, fear and mistrust of authority figures, and inability to engage in normal, healthy emotionally and physically intimate relationships.

## COUNT I (against both Defendants)
## NEGLIGENCE AND NEGLIGENCE PER SE

46.     Plaintiff incorporates by reference all of the preceding paragraphs as if fully set forth at length herein.

47.     At all relevant times, the Diocese and Sacred Heart concealed instances of child sexual abuse and complaints by victims.

48.     At all relevant times, the Diocese and Sacred Heart zealously maintained secrecy concerning rampant child sexual abuse by clergy and employees by, among other tortious acts and omissions:

   a.   Failing to disclose complaints to law enforcement officials, parishioners, and the public;

   b.   Maintaining secret archives and files of evidence of sex abuse, accessible only to the bishop and his designee;

   c.   Destroying incriminating documents and spoliation of evidence regarding sexual abuse by diocesan employees;

   d.   Threatening and coercing victims and their families to withdraw complaints and retract

allegations of sexual abuse;

e. Paying "hush money" to victims and their families, in exchange for promises of non-disclosure and confidentiality.

49. In or around 1979-1983, Plaintiff was sexually molested, or otherwise abused and mistreated by Wiggs on numerous occasions.

50. Wiggs's tortious conduct toward Plaintiff was within the scope of his relationship with the Diocese and Sacred Heart because they occurred or were made possible by that relationship (including the grooming and sexual abuse of Plaintiff and other individuals that Wiggs perpetrated), and were ratified expressly or impliedly by the Diocese and Sacred Heart.

51. The Diocese and Sacred Heart ratified Wiggs's conduct by declining to discipline him for his inappropriate conduct toward and sexual abuse of Plaintiff, and by enabling him through their inaction to continue to sexually abuse Plaintiff under the guise of offering spiritual guidance. The Diocese and Sacred Heart chose not to report Wiggs to authorities, declined to remove his faculties, and declined to discipline him, although both knew of Wiggs's misconduct toward and abuse of minors.

52. The Diocese and Sacred Heart, by and through each of their agents, servants, and/or employees, knew or reasonably should have known of Wiggs's sexual interest in children and misconduct and abuse of children; and that Wiggs was capable of committing immoral and criminal acts upon Plaintiff and other children. The abuse, assault, and damages suffered by Plaintiff at the hands of Wiggs were eminently foreseeable by the Diocese and Sacred Heart before they occurred.

53. At the time that Wiggs abused Plaintiff, Plaintiff and his family were unaware of the Diocese's and Sacred Heart's knowledge of Wiggs's inappropriate behavior and sexual interest in children.

54. Plaintiff and his family were misled by the Diocese and Sacred Heart with regard to

the Diocese's knowledge of Wiggs's history and propensity for committing sexual abuse and misconduct.

55.     The Diocese and Sacred Heart had a duty to protect Plaintiff, whether he was a parishioner or not, while their priest was serving as a mentor and spiritual guide for Plaintiff and while Plaintiff was present at the Sacred Heart rectory.

56.     The Diocese and Sacred Heart owed Plaintiff a duty to protect him against unreasonable physical harm, including any harm foreseeably caused by a third party.

57.     The Diocese and Sacred Heart were under a duty to exercise reasonable care so to control the conduct of Wiggs and prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them.

58.     The Diocese and Sacred Heart failed to warn Plaintiff or his parents of the danger Wiggs posed. Both thus exposed Plaintiff to Wiggs's proclivity for sexual assault and thereby caused Plaintiff physical injury.

59.     Before Wiggs's sexual abuse of Plaintiff began, the Diocese and Sacred Heart knew or should have known that Wiggs posed a serious risk to the physical safety to Plaintiff and other children.

60.     It was foreseeable that Wiggs would physically injure children such as Plaintiff, because, among other reasons, the Diocese and Sacred Heart knew or should have known that he had sexually abused children and otherwise committed sexual misconduct.

61.     Furthermore, the Diocese and Sacred Heart knew or had reason to know that Wiggs sexually abused children, including Plaintiff, and caused them bodily harm. Plaintiff and other children were in danger of future harm and were helpless due to their age, Wiggs's status as a person of authority in the Diocese and at Sacred Heart, and the physical and emotional injuries they suffered from Wiggs's conduct, which were directly and proximately caused by the Diocese's and Sacred

Heart's negligent, reckless, and intentional conduct described herein. The Diocese and Sacred Heart had a continuing duty to exercise reasonable care to prevent such further injury.

62. The Diocese and Sacred Heart's failure to exercise reasonable care increased the risk of harm to Plaintiff and other children. Families and children, including Plaintiff and his parents, relied on the Diocese, Sacred Heart, and Wiggs and suffered due to their reliance and the Diocese and Sacred Heart's breaches of duty.

63. The Diocese and Sacred Heart systematically breached their duties to Plaintiff in all of the aforementioned ways, and by:

    a. Negligent performance of their undertaking in ordaining and employing Wiggs;

    b. Failing to fire and report Wiggs;

    c. Enabling Wiggs to have unrestricted access to children and placing him in a position of trust and control despite knowing he had a propensity to sexually abuse Plaintiff and other children;

    d. Failing to warn Plaintiff, his family, other parishioners, and the community of Wiggs's criminal sexual proclivities and the dangerous conditions his behavior created;

    e. Failing to prevent Wiggs from committing physical and psychologically abusive acts upon Plaintiff;

    f. Failing to properly adopt and enforce child sexual abuse reporting, prevention, intervention, and investigation protocols within the Diocese and comply with applicable child sexual abuse reporting laws and other requirements;

    g. Failing to monitor for and subsequently investigate allegations of sexual, physical, and psychological abuse committed by any employee, volunteer, or agent of the Diocese;

    h. Failing to timely notify law enforcement, government, and child protection agencies of allegations of child sexual abuse against employees and other actual or apparent

agents of the Diocese;

i. Failing to provide a safe environment where children were not subjected to sexual and psychological abuse;

j. Holding Wiggs out as being an individual of moral and ethical repute;

k. Failing to terminate Wiggs's employment and faculties, and failing to impose any meaningful sanction on his behavior, after they knew or should have known that he had sexually abused one or more children;

l. Failing to comply with statutes, rules, regulations, and ordinances enacted for one or more classes of persons that include Plaintiff (e.g., children, and victims of sexual abuse), enacted to prevent injuries of the type sustained by the Plaintiff, which imply a private right of action or impose liability under a negligence per se theory, including but not limited to statutes and regulations imposing a duty on the Diocese and Sacred Heart to report abuse committed by Wiggs to law enforcement and state authorities;

m. Negligent entrustment in permitting Wiggs to use his position in and faculties granted by the Diocese to engage in the sexual abuse at Sacred Heart, and assault and battery of children, including Plaintiff, when Defendants knew or should have known that Wiggs was likely to use his position, made possible by Defendants, to abuse Plaintiff and other children;

n. Acting negligently under legal theories articulated in Restatement (Second) of Torts §§ 310–11, 313, 314A, 319, and 321, among others;

o. Violating policies and procedures that reflected the standard of care; and

p. Other negligent acts and omissions that may be disclosed during the course of discovery.

64. Through each of these negligent acts and omissions, the Diocese and Sacred Heart

acted in reckless disregard of the safety of Plaintiff and knew or had reason to know of facts which would lead a reasonable person to realize, not only that their conduct created an unreasonable risk of physical harm to Plaintiff and other children, but also that such risk was substantially greater than that which is necessary to make their conduct negligent.

65.     It was reasonably foreseeable that if the Diocese and Sacred Heart did not adequately exercise the duty to provide reasonable care to the children exposed to Wiggs, their agent and representative, such children would be vulnerable to sexual abuse by Wiggs.

66.     The failure of the Diocese and Sacred Heart to protect Plaintiff from the foreseeable harm of Wiggs's sexual, physical, and psychological misconduct was committed with negligence, gross negligence, wanton recklessness, or reckless indifference to Plaintiff.

67.     Each of the aforementioned negligent acts and omissions committed by the Diocese and Sacred Heart directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT II (against both Defendants)
## NEGLIGENT SUPERVISION, MONITORING, and RETENTION

68.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

69.     Supervision of agents, servants, and employees within the Diocese and Sacred Heart's control was mandatory and created an unqualified duty upon it.

70.     The Diocese and Sacred Heart, directly and by and through their actual or apparent

agents, servants, and employees, undertook or otherwise had a duty to engage in reasonable supervision, monitoring, and retention of any employees, agents, or representatives, including Wiggs at Sacred Heart, who interacted with children, held positions that brought them within close proximity of children, or accepted responsibility for children.

71. The Diocese and Sacred Heart, directly and by and through their actual or apparent agents, servants, and employees, knew or reasonably should have known of Wiggs's sexual interest in children; his sexual, physical, emotional, and psychological violence upon victims before, during, and after the time when he was abusing Plaintiff; and that he was capable of committing sexual, physical, emotional and psychological violence against Plaintiff and others.

72. The Diocese and Sacred Heart failed to properly observe, supervise, and monitor areas and individuals where it was known, knowable, or foreseeable that vulnerable children could fall victim to sexual, physical, emotional and psychological abuse without proper supervision.

73. The Diocese and Sacred Heart systematically breached their duties to Plaintiff by:

    a. Failing to protect Plaintiff from abusive conduct by Wiggs;

    b. Failing to properly monitor and supervise Wiggs;

    c. Failing to force Wiggs to resign his position and faculties;

    d. Failing to institute an effective child sexual abuse reporting process, intervention protocols, investigative procedures, and procedures to follow upon a substantiated finding of abuse;

    e. Failing to prevent Wiggs from committing psychologically and sexually abusive acts upon Plaintiff;

    f. Failing to monitor for and subsequently investigate acts of sexual, physical, emotional, and psychological abuse and immoral conduct committed by any employee including Wiggs;

g.   Failing to provide a safe environment where children are protected from sexual abuse;

h.   Failing to promptly remove Wiggs from all interaction with children, including Plaintiff, after initial allegations that Wiggs was acting inappropriately with children;

i.   Failing to sufficiently punish, reprimand, remove, or dissuade Wiggs from continuing to sexually abuse children; and

j.   Other acts and omissions that may become apparent during the course of discovery.

74.   The Diocese and Sacred Heart's negligent supervision, negligent retention, and negligent failure to protect Plaintiff from the foreseeable harm of Wiggs's sexual, physical, emotional, and psychological abuse was a result of negligence, gross negligence, wanton recklessness, or reckless indifference to Plaintiff.

75.   Each of the Diocese and Sacred Heart's aforementioned negligent acts and omissions relative to monitoring, supervision, and retention of Wiggs directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT III (against both Defendants)
## NEGLIGENT TRAINING

76.   Plaintiff incorporates by reference all of the preceding paragraphs as if fully set forth at length herein.

77.   At all times material to this action, the Diocese and Sacred Heart were responsible for the training and education of their employees, agents, and/or representatives pertinent to the recognition of, monitoring for, and prevention of child sexual abuse.

78.     Despite the Diocese and Sacred Heart's knowledge that sexual abuse of children was being perpetrated by their actual and apparent agents, servants, and employees (including Wiggs), the Diocese and Sacred Heart failed to take preventative and reactive measures in the form of training to address systemic problems of training and supervision of clergy and parish staff.

79.     The Diocese and Sacred Heart failed to sufficiently train and educate with respect to Wiggs's sexual abuse of children, including Plaintiff, by:

    a.    Failing to educate and inform parishioners, clergy, and other members of the church that sexual abuse may have occurred or was at risk of occurring;

    b.    Failing to educate and train church leaders, including vicars, bishops, diocesan administrators, and other supervisory personnel, as to how to detect, prevent, monitor for, report, and investigate child sexual abuse within the Diocese or within Sacred Heart;

    c.    Failing to educate and train employees, agents, servants, and representatives, including priests, as to how to detect, prevent, monitor for, and report child sexual abuse;

    d.    Failing to educate and train priests and other members of the clergy on how to establish appropriate boundaries and relationships with children;

    e.    Failing to train Wiggs as to how to maintain appropriate professional boundaries with Plaintiff and other children;

    f.    Other acts and omissions as may become apparent during the course of discovery.

80.     The failures of the Diocese and Sacred Heart to protect Plaintiff from the foreseeable harm of Wiggs's sexual, physical, emotional, and psychological abuse by providing sufficient training was as a result of negligence, gross negligence, wanton, recklessness, and/or reckless indifference to Plaintiff.

81.     Each of the Defendants' aforementioned negligent acts and omissions with respect to training directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

### COUNT IV (against both Defendants)
### BREACH OF FIDUCIARY DUTY

82.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

83.     At all times material to this action, Plaintiff was entrusted by his parents to Wiggs as a result of his status as a man of God and supposedly good character within the Diocese of Memphis and Sacred Heart Catholic Church.

84.     As a result of his position, Wiggs was always representing the Diocese and Sacred Heart in all his interactions with the community at large.

85.     Wiggs did outreach on behalf of the Catholic Church at Plaintiff's grandparents' home and was a frequent fixture at their home as one of his methods to spread the gospel and admirably represent the Diocese and Sacred Heart.

86.     Plaintiff respected Wiggs and his position of authority in the Church.

87.     Wiggs took Plaintiff on outings and engaged with him in the community and was allowed to do so by Plaintiff's family due to his status in the Church.

88.     Due to the nature of Wiggs's relationship with Plaintiff and the community on behalf of the Diocese and Sacred Heart, Defendants were required to provide Plaintiff with physical care and

protection in the same capacity as a reasonably prudent parent.

89. The Diocese and Sacred Heart each maintained a fiduciary relationship of trust and confidence with Plaintiff where the Defendants undertook to actively engage in fostering, promoting, and safeguarding Plaintiff's well-being via their agent Wiggs.

90. By virtue of Wiggs's position of authority within the Diocese and Sacred Heart, Plaintiff understood that Wiggs was owed a high degree of respect and obedience.

91. The Diocese and Sacred Heart confided the performance of their duty to Plaintiff to Wiggs as their agent, employee, and representative.

92. As an agent and representative of the Diocese, Wiggs deepened and affirmed the Diocese and Sacred Heart's fiduciary relationship with Plaintiff because he singled Plaintiff out and spent time with him under the guise of providing Plaintiff with guidance while acting in his capacity as an employee of the Diocese and Sacred Heart.

93. Plaintiff placed his trust and confidence in the Diocese, Sacred Heart, and Wiggs, as their agent and employee, thereby placing the Defendants in a position of influence and superiority over him.

94. In addition to the Defendants' duties *in loco parentis*, the fiduciary relationship between Plaintiff and each Defendant created an affirmative duty on the part of each Defendant to act in Plaintiff's best interest and to protect him, considering his age of minority and vulnerability at all times.

95. The Diocese and Sacred Heart were obligated to do the following, among other responsibilities they had toward Plaintiff:

   a. Prevent Wiggs from being placed in a position where he could sexually assault and harass Plaintiff;

   b. Provide notice and warning to Plaintiff and his parents that Wiggs was acting inappropriately with Plaintiff in a manner suggesting he was committing or intended

to commit sexual acts against Plaintiff;

c.  Intervene to prevent Wiggs's sexual abuse of Plaintiff once it was discovered;

d.  Reach out to Plaintiff after the abuse ended to disavow Wiggs's representations to Plaintiff that his abuse was in any way permissible;

e.  Otherwise exercise their control to prevent and intervene in Wiggs's abuse of Plaintiff and ameliorate the devastating consequences of that abuse after it occurred;

f.  Disclose their own negligence and wrongdoing to Plaintiff, including their tortious conduct in placing Wiggs in a position where he could sexually abuse Plaintiff, and in failing to act to prevent Wiggs's sexual abuse of Plaintiff;

g.  Disclose to Plaintiff that he may have one or more causes of action against Defendants;

h.  Timely address the devastating effects of Wiggs's abuse on Plaintiff by offering or securing for Plaintiff emotional, medical, and financial assistance, and holding Wiggs meaningfully accountable; and

i.  Report Wiggs's abuse or suspicions of that abuse to local and state law enforcement and regulatory authorities.

96.  As a fiduciary to Plaintiff, Wiggs was duty-bound to protect Plaintiff from harm while he was in his care, speak to him truthfully and without purposeful manipulation, and establish an appropriate relationship with Plaintiff as a supervisor and mentor. Wiggs breached his duty by, among other acts and omissions, sexually abusing and manipulating Plaintiff, and failing to disclose the wrongfulness of his conduct to Plaintiff.

97.  The Diocese and Sacred Heart were or should have been aware that Wiggs made misrepresentations to Plaintiff concerning the nature of his sexual abuse, and that he was using the his relationship with Plaintiff's family (as fostered by his role as an agent of Defendants) to influence

Plaintiff and others into believing that the abuse was a necessary and allowable thing required or sanctioned by God, the Catholic faith, or a Catholic theology of love.

98.     Defendants' ratification of and silence about Wiggs's sexual abuse breached their duties to Plaintiff and fraudulently concealed Plaintiff's claims against the Diocese and Sacred Heart.

99.     Plaintiff had no reason to suspect that the Diocese and Sacred Heart entered a scheme of concealment and fraud with Wiggs. Plaintiff believed that the Diocese and Sacred Heart would not tolerate conduct that was immoral and illegal and that Wiggs would not commit such wrongful acts.

100.     Plaintiff was under no obligation to search for wrongdoing by the Diocese and Sacred Heart where he reasonably believed the Diocese would uphold their duties to act in Plaintiff's best interest and keep him safe.

101.     Plaintiff only realized the extent of the Diocese's and Sacred Heart's concealment of Wiggs's sexual abuse in the aftermath of an article published by Katherine Burgess of Commercial Appeal on or around October 17, 2023 regarding Plaintiff's own abuse.

102.     Although Plaintiff knew of his own abuse prior to that date, he did not know and had no reason to believe that there were other victims who had been abused by Wiggs and that each Defendant knew or should have known about Wiggs's abuse.

103.     Once the Commercial Appeal article was published, Plaintiff initiated the filing of this suit as he realized the gravity and severity of what the Diocese and Sacred Heart had done to obfuscate the truth.

104.     The Diocese and Sacred Heart breached their fiduciary duties to Plaintiff for all the reasons previously stated.

105.     By breaching their fiduciary duties, the Diocese and Sacred Heart directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants in an amount

exceeding the monetary jurisdictional limits of any and all lower Courts that would otherwise have jurisdiction, in amounts to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT V (against both Defendants)
## CONSTRUCTIVE FRAUD

106.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

107.     As described above, the Diocese and Sacred Heart had a fiduciary and confidential relationship of trust and confidence with Plaintiff.

108.     Plaintiff's position in his relationship with each Defendant was one of subordinate weakness and dependence, whereas the Diocese and Sacred Heart were in a position of superior knowledge and influence. Accordingly, they did not deal on equal terms.

109.     The Diocese and Sacred Heart betrayed the fiduciary duty owed to Plaintiff as a result of the relationship of trust and confidence, by failing to inform Plaintiff of Wiggs's dangerous nature and by later failing to act to remove Wiggs.

110.     The Diocese and Sacred Heart also betrayed the fiduciary duty owed to Plaintiff as a result of the relationship of trust and confidence, by failing to inform Plaintiff he had one or more causes of action against the Diocese and/or Sacred Heart for their misfeasance and nonfeasance concerning the retention and supervision of Wiggs.

111.     Further, the Diocese and Sacred Heart held themselves out as institutions that would protect vulnerable children. Their failure to investigate, punish, and remove Wiggs, and failure to protect the community from and seek to remedy the effects of his sexual abuse and misconduct, are examples of a course of conduct that had the intent and effect of deceiving and misleading Plaintiff and the public about Defendants' focus on the protection of children and the well-being and safety of

their parishioners and the communities they purported to serve.

112.     The Diocese and Sacred Heart had an accumulation of critical knowledge of the sexual abuse of children by their employees and clerics, including Wiggs, which they kept from Plaintiff, his parents and the general public.

113.     Wiggs betrayed the fiduciary duty owed to Plaintiff as a result of a relationship of trust and confidence and conspired with the Diocese and Sacred Heart, by holding himself out as a moral and ethical individual and a representative of God while engaged in the systematic sexual abuse of Plaintiff.

114.     Defendants' aforementioned constructive fraud directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT VI (against both Defendants)
## FRAUD

115.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

116.     The Diocese and Sacred Heart held Wiggs out and affirmatively represented that Wiggs was fit to serve at Sacred Heart on behalf of the Diocese and was a person of good moral character and an appropriate person to provide children with spiritual guidance, mentoring, and supervision.

117.     With the knowledge of the Diocese and Sacred Heart, Wiggs held himself out as a pious and fit person who would obey the policies and procedures of the Diocese and Sacred Heart

and would uphold the requisite moral and ethical values and protect the safety of children.

118.    The representations made by the Diocese and Sacred Heart concerning Wiggs's fitness to serve in ministries were false.

119.    At all times material herein, the Diocese and Sacred Heart by and through their agents and employees, knew or should have known that these representations were false.

120.    The Diocese and Sacred Heart, directly and by and through Wiggs and their leaders, agents and employees, made the following misrepresentations of fact, among others as set forth in this complaint and as may be disclosed during formal discovery in this action:

    a.    That Wiggs was fit to serve as a minister to young people;

    b.    That Wiggs was an appropriately trained employee who had agreed to comply with the policies, procedures, and code of conduct of the Diocese; and

    c.    That the Diocese and Sacred Heart had no knowledge or reason to know that Wiggs would sexually abuse Plaintiff or commit misconduct toward other parishioners, parish staff, or the community at large.

121.    The Diocese and Sacred Heart engaged in extreme and outrageous conduct by appointing and retaining Wiggs in a leadership role and representing that he was fit to serve the community while concealing and withholding information from the community, including Plaintiff, his peers, and his parents.

122.    Even after discovering that Wiggs sexually abused Plaintiff at Sacred Heart and committed sexual misconduct against other individuals, the Diocese and Sacred Heart concealed Wiggs's actions and chose not to investigate his conduct, make findings, impose appropriate discipline, and report to law enforcement.

123.    Further, the Diocese and Sacred Heart concealed the abuse so as to not subject itself to legal action, "scandal," loss of financial support, or embarrassment due to the heinous nature of

Wiggs's crimes.

124.     The Diocese's and Sacred Heart's aforementioned fraud directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## COUNT VII (against both Defendants)
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

125.     Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

126.     The Diocese and Sacred Heart intentionally engaged in extreme and outrageous conduct by:

    a.     Falsely representing to their parishioners, the Archdiocese, and the general public that Wiggs was an individual with whom children, including Plaintiff, could safely interact;

    b.     Allowing Wiggs to spend time alone with Plaintiff on repeated occasions;

    c.     Failing to prevent Wiggs from sexually abusing Plaintiff despite reasonable knowledge that Wiggs was or would attempt to do so;

    d.     Failing to stop Wiggs from continuing to abuse Plaintiff;

    e.     Failing to inform Plaintiff and his parents that Wiggs's conduct was immoral and a crime, and failing to denounce his actions; and

    f.     Other tortious acts and omissions as may become apparent during the course of discovery.

127.     The Diocese and Sacred Heart's aforementioned actions and extreme and outrageous

conduct directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

**COUNT VIII (against both Defendants)**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

128. Plaintiff incorporates by reference all of the preceding paragraphs as though fully set forth at length herein.

129. The Diocese and Sacred Heart each had a duty to Plaintiff to, among other things, avoid inflicting emotional distress on him, and to take affirmative steps to avoid having Wiggs inflict emotional harm on him.

130. The Diocese and Sacred Heart breached these duties by:

a. Falsely representing to their parishioners and the general public that Wiggs was an individual with whom children, including Plaintiff, could safely interact;

b. Remaining silent as to Wiggs's history of and propensity for sexual assault, which allowed Wiggs to spend time alone with Plaintiff on repeated occasions;

c. Failing to prevent Wiggs from sexually abusing Plaintiff despite reasonable knowledge that Wiggs was or would attempt to do so;

d. Failing to stop Wiggs from continuing to abuse Plaintiff;

e. Knowingly failing to investigate Wiggs, failing to inform Plaintiff and his parents that Wiggs's conduct was immoral and a crime, and failing to denounce his actions; and

f. Other tortious acts and omissions as may become apparent during the course of

discovery.

131.    Furthermore, the Diocese and Sacred Heart's repeated, patterned behavior of turning a blind eye to Wiggs's inappropriate conduct with Plaintiff was negligent.

132.    As a result of the Diocese's and Sacred Heart's negligent conduct, Plaintiff suffered severe emotional distress over a period of years and continues to suffer today.

133.    Defendants' aforementioned negligent conduct directly and proximately caused Plaintiff to sustain severe and permanent damages as described in paragraph 45.

WHEREFORE, Plaintiff demands judgment for damages against Defendants, in an amount exceeding the monetary jurisdictional limits of any and all lower courts that would otherwise have jurisdiction and to be determined upon trial of this action, together with interest, costs, and any other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief for each and every cause of action above, in addition to any others that may be disclosed during the course of discovery:

134.    That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

135.    That the Plaintiff be awarded fair and reasonable damages, including compensatory damages in an amount to be determined by the jury;

136.    That the Plaintiff be awarded the costs of trying this action;

137.    That this action be heard by a jury;

138.    That costs of this action be taxed to the Defendants;

139.    That prejudgment interest be awarded to the Plaintiff;

140.    That the Plaintiff be awarded any and all such other and further relief as the Court deems proper; and,

141. That Plaintiff's right to amend this Complaint be reserved.

Respectfully submitted,

John Spragens, TN Bar No. 31445
Spragens Law PLC
311 22nd Avenue North
Nashville, TN 37203
Telephone: (615) 983-8900
Fax: (615) 682-8533
john@spragenslaw.com

Adina S. Katz (*to apply pro hac vice*)
Andrew S. Janet (*to apply pro hac vice*)
JANET, JANET & SUGGS, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030
akatz@jjsjustice.com
asjanet@jjsjustice.com