**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| RALPH TURNER CASEY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | No. 2:24-cv-02660-SHL-tmp |
| | * | JURY DEMANDED |
| CATHOLIC DIOCESE OF MEMPHIS | * | |
| and SACRED HEART CATHOLIC CHURCH, | * | |
| | * | |
| Defendants. | * | |

**PLAINTIFF RALPH TURNER CASEY'S MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff Ralph Turner Casey, by and through his undersigned counsel, hereby timely

responds and respectfully opposes Defendants Catholic Diocese of Memphis (the "Diocese") and

Sacred Heart Catholic Church ("Sacred Heart")'s Motion to Dismiss. Plaintiff's Complaint is not

barred by limitations as Plaintiff has properly pled facts that establish entitlement to tolling under

the discovery rule and the doctrine of fraudulent concealment.

**BACKGROUND**

As detailed in the Complaint, Father Joel M. Wiggs ("Wiggs"), an employee and agent of

the Diocese and Sacred Heart, sexually abused Plaintiff on numerous occasions over the course

of three years when Plaintiff was a minor. (Compl. ¶¶ 24-37.) Defendants were aware that Wiggs

was a danger to Plaintiff and other young boys of similar ages, but employed and empowered

Wiggs despite the fact that Defendants knew or should have known that Wiggs committed prior

sexual misconduct and posed a risk of committing sexual misconduct against minors in the

community, including Plaintiff. (Compl. ¶¶ 41-81.)

- 1 -

"At the time that Plaintiff was abused by Wiggs, Plaintiff and/or his family were unaware of the Diocese's knowledge of Wiggs's sexual interest in young boys. In fact, Plaintiff and/or his family were misled by the Diocese and Sacred Heart with regard to their knowledge of Wiggs's history and propensity for committing sexual abuse upon minors." (Compl. ¶ 41.) "After learning about Wiggs's abuse of minors, the Diocese and Sacred Heart actively took steps to protect Wiggs, conceal their own wrongdoing in supervising (or failing to supervise) Wiggs, and prevent survivors of abuse by Wiggs from filing civil lawsuits." (Compl. ¶ 42.)

Until October of 2023, Plaintiff had no idea that Defendants in this suit were involved in facilitating and covering up Wiggs's abusive, illegal conduct. On October 17, 2023, *The Commercial Appeal* published an article (the "Article"), detailing, for the first time, Defendants' role in Plaintiff's ordeal. Soon after, multiple people contacted Plaintiff and informed him about other survivors of abuse by Wiggs. (*Id.*) Only in reading this Article was Plaintiff put on notice that Defendants knew or should have known that Wiggs had a history of sexual misconduct and posed a danger to children, including Plaintiff. Defendants had nonetheless hired and kept Wiggs as a pastor, placing him in a position of honorable authority and trust; enabled Wiggs to have unrestricted access to children; and failed to implement and enforce policies and procedures that would have protected Plaintiff. Although Plaintiff was aware that he had been sexually abused by Wiggs, he did not have notice until October 17, 2023, that the Diocese and Sacred Heart's tortious conduct enabled the abuse itself.

Plaintiff filed this Complaint in September 2024, and Defendants have moved to dismiss this case for failure to state a claim on the basis that the claims set forth in the Complaint are time-barred by the applicable statutes of limitations.

**STANDARD**

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing Fed. R. Civ. P. 8(a)(2)). While Rule 8 does not require "detailed factual allegations," it "demands more than demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotation omitted). The pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id*. And it cannot simply tender "naked assertion[s]" devoid of "further factual enhancement." *Id*. at 678 (citing *Twombly*, 550 U.S. at 557). On a motion to dismiss, courts must "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).

A claim is considered facially plausible when the plaintiff presents factual allegations that enable the court to reasonably infer that the defendant is responsible for the alleged misconduct. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). This plausibility standard does not require the plaintiff to show that the defendant's liability is probable, but it does demand more than a mere possibility that the defendant acted unlawfully. *Id*. If "a complaint pleads facts that are 'merely consistent with' a defendant's liability," the claim falls short of crossing the line from possible to plausible entitlement to relief. *Id*. (citing *Twombly*, 550 U.S. at 557).

## ARGUMENT

In their Motion to Dismiss (ECF No. 12) and accompanying Memorandum (ECF No. 12-1), Defendants argue that Plaintiff's claims are time-barred under the applicable statutes of limitations and that neither the discovery rule nor the doctrine of fraudulent concealment should toll the limitations period. Defendants' argument fails, however, and their Motion to Dismiss should be denied because Plaintiff has properly pled facts that establish entitlement to tolling under the discovery rule and the doctrines of fraudulent concealment.

This case is not against Wiggs. Rather, it is about Defendant Diocese and Defendant Sacred Heart, in light of their negligence in facilitating Wiggs's sexual abuse of Plaintiff—negligence that did not come to light until October 17, 2023. Several doctrines, including the discovery rule and the doctrine of fraudulent concealment, prevent the limitations period from beginning until, at the earliest, October 17, 2023. Plaintiff, due to Defendants' acts and omissions, could not have reasonably discovered Defendants' role in his abuse and the subsequent coverup until October 17, 2023, after which time he timely filed this lawsuit.

> **A.      The limitations period should be tolled under the discovery rule because Plaintiff could not have reasonably discovered his claims against Defendants until the October 17, 2023, article in *The Commercial Appeal*.**

A claim does not accrue, for limitations purposes, until a plaintiff can reasonably or actually does discover "(1) the occasion, the manner and means by which a breach of duty occurred that produced his [or her] injury; and (2) the identity of the defendant who breached the duty." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (quoting *Foster v. Harris*, 633 S.W.2d 304, 305 (Tenn. 1982)). "In general, the inquiry of when a plaintiff knew of or should have discovered a cause of action is a question of fact not properly decided on summary judgment," which means it certainly should not be decided in a motion to

dismiss. *Coffey v. Coffey*, 578 S.W.3d 10, 21 (Tenn. Ct. App. 2018) (citing *City State Bank v.*

*Dean Witter Reynolds, Inc*., 948 S.W.2d 729, 735 (Tenn. App. 1996)).

Defendants ask that this Court follow *Schultz v. Davis*, 495 F.3d 289 (6th Cir. 2007) in

applying the discovery rule, asserting that the rule tolls the statute of limitations only when the

injury itself—rather than the identity of the defendant—cannot be discovered. (Defs.' Mem.,

ECF No. 12-1, at 15 (citing *Schultz*, 495 F.3d at 292-293).) To support this position, Defendants

contend that "in every post-*Redwing* Sixth Circuit case on the issue, the federal courts have

followed *Schultz* and limited *Redwing* to its particular facts." (*Id*.) However, the cases in which

the Sixth Circuit followed *Schultz* are distinguishable from the present case. Here, the facts

mirror *Redwing*, where the discovery rule provides that a cause of action accrues when the

plaintiff discovers both the injury and the "identity of the person or persons whose wrongful

conduct caused the injury." *Redwing*, 363 S.W.3d at 458, 462. This rule, clarified and applied in

*Redwing*, arose under circumstances materially similar to those in this case. Therefore, *Redwing*,

not *Schultz*, offers the appropriate framework for applying the discovery rule.

In *Schultz v. Davis*, 495 F.3d 289 (6th Cir. 2007), the plaintiff sued for injuries sustained

when 120 pounds of sheetrock fell on her leg and ankle while she was viewing a house under

construction. The Sixth Circuit, applying Tennessee law, declined to toll the statute of limitations

until the plaintiff discovered or reasonably should have discovered the identity of the defendant,

holding that the limitations period begins when the injury itself is or should have been

discovered. *See Schultz*, 495 F.3d at 292-293. The Sixth Circuit made the following findings in

reaching its decision: (1) Ms. Schultz's injury was "immediate and apparent" on the day of the

incident; (2) Ms. Schultz "knew or was put on notice on [the day of the incident]" that her injury

resulted from allegedly wrongful or tortious conduct, even if she may not have known the

specific tortfeasor; (3) a reasonable person who suffers an injury on property that she does not own will attempt to determine who owns the property; (4) Ms. Schultz and her family "could have easily determined" the identity of the property owner; (5) Ms. Schultz and her family were put on notice on the date of the incident that her "injury was likely caused by the improper stacking of the sheetrock" and thus "should have known that they could have a cause of action against the party who delivered and stacked the sheetrock." *Id*. The Sixth Circuit further distinguished Ms. Schultz's case from *Foster v. Harris*, 633 S.W.2d 304 (Tenn. 1982), where the limitations period was tolled because the identity of the tortfeasor was unknown and critical to the case. In *Foster*, the statute of limitations could not begin to run if neither the existence of nor the identity of the wrongdoer was known to the plaintiff. *Foster*, 633 S.W.2d at 304-05.

This instant case contains no facts similar to *Schultz* and is thus distinguishable. Ms. Schultz knew right away that her "injury was likely caused by the improper stacking of the sheetrock." *Schultz*, 495 F.3d at 293. The wrongful act and resulting harm were immediately observable. In contrast, Plaintiff's injury—sexual abuse by Wiggs—was not immediately identifiable as wrongful conduct attributable to anything other than Wiggs's own sexual predilections. At the time, it was not widely known or suspected that dioceses—or this diocese in particular—would conceal information about sexual abuse of which they were aware. Moreover, sexual abuse often involves manipulation, secrecy, and the victim's lack of understanding of the abusive nature of the conduct, particularly when the victim is a child. While Plaintiff later suspected that Wiggs's behavior was abusive and that he was unfit to serve as a priest, the critical issue is whether the Diocese and Sacred Heart had knowledge of Wiggs's misconduct. Unlike in *Schultz*, this knowledge was not readily accessible and could not have been easily or reasonably discovered by Plaintiff.

Moreover, in *Schultz*, the injury occurred on someone else's property, and a simple

inquiry into ownership records could have revealed the liable parties' identities. *Schultz*, 495 F.3d

at 293 (observing that the plaintiffs in that case "could have easily determined" the owner of the

property through a review of the applicable deeds). By contrast, the wrongful conduct in the

instant case took place in private, personal, and insulated settings, with no apparent indication

that the Diocese or Sacred Heart was aware of Wiggs's behavior, let alone complicit in failing to

address it. Inquiries at the time would not necessarily have made clear that the Diocese or Sacred

Heart were complicit, because they would have denied their complicity and likely still deny it.

Determining whether Defendants knew or should have known about Wiggs's misconduct and

unfitness would have required access to internal church records, complaints, or knowledge held

within the institution—information not accessible to a child or layperson. This challenge is

compounded when an institution is not forthcoming and actively conceals its wrongdoing, as

occurred in this case. Before the Article was published in October 2023, Plaintiff had no

reasonable basis that the Diocese or Sacred Heart possessed knowledge of Wiggs's misconduct

or had breached a duty to supervise Wiggs.

Additionally, the cause of the injury in *Schultz* (improper stacking of sheetrock) was

straightforward and identifiable on the day of the incident. Any reasonable person in Ms.

Schultz's position would have quickly and immediately linked her injury to the property owner

or the party responsible for stacking the sheetrock. Ms. Schultz did not need to uncover

institutional failures or hidden knowledge to identify a potential claim. Here, however, Plaintiff's

injury stems from Defendants' institutional failure to monitor or address Wiggs's unfitness,

failures that were neither obvious nor discoverable at the time of the abuse. Unlike the visibly

suspicious circumstances in *Schultz*, the Diocese and Sacred Heart's knowledge of Wiggs's

conduct was concealed and not apparent at the time of the injury.

Moreover, it would be both unreasonable and deeply troubling to suggest that Plaintiff, or

anyone in a similar position, would immediately assume that a priest's abusive and illegal

conduct was necessarily known to or attributable to the Diocese that employs him. Such a

conclusion would defy the trust and expectations that individuals, especially vulnerable children,

place in religious institutions.

The Sixth Circuit also distinguished *Foster* on the basis that Ms. Schultz immediately

knew both injury and potential tortfeasors, whereas in *Foster*, the plaintiff did not know the

existence or identity of the tortfeasor, which was a critical issue in determining when the statute

of limitations began to run. *See Foster*, 633 S.W.2d at 305 (holding that the statute of limitations

tolls until the plaintiff discovers "the identity of the defendant who breached the duty"); *see also*

*Schultz*, 495 F.3d at 292 (noting that, in *Foster*, "*who* caused the injury was a critical issue," and

contrasting that situation with the facts in *Schultz*). The *Foster* principle applies here because

Plaintiff did not and could not have known that the Diocese and Sacred Heart were tortfeasors.

He could not have known that the Diocese and Sacred Heart had knowledge of Wiggs's unfitness

or that they breached a duty to prevent his misconduct. The critical issue here is not just the

existence of an injury, but whether Defendants' actions or omissions caused the harm. Unlike

*Schultz*, where the cause of the injury was clear and observable, this case involves concealed

knowledge and institutional failings that were neither apparent nor reasonably discoverable at the

time of the abuse.

The additional cases referred by Defendants that followed *Schultz* include *Smith v.*

*Amazon Fulfillment Services*, 2021 WL 4693522 (E.D. Tenn. October 7, 2021) (a case where a

truck driver plaintiff sustained injuries after tripping over a cone that one of the defendants'

employees placed on the driver's side of the plaintiff's truck without warning her). These cases

also include those cited in *Smith*: *Miller v. Shults*, No. 3:19-CV-308-TAV-DCP, 2021 WL

2168952 (E.D. Tenn. May 27, 2021), *aff'd sub nom. Miller v. Cocke Cnty., Tennessee*, No. 21-

5585, 2022 WL 103143 (6th Cir. Jan. 11, 2022) (a Section 1983 claim where the plaintiff

suffered injuries as a result of a police's use of excessive force), *Warter v. Volunteer Taxi Inc.*,

No. 3-14-1981, 2016 WL 1244712 (M.D. Tenn. Mar. 30, 2016) (a wrongful death case where the

plaintiff claimed negligence by a taxi driver and taxi company), *Ruge v. Bailey Co.*, No. 3-13-

0448, 2015 WL 4042201 (M.D. Tenn. July 1, 2015) (a product liability case where the plaintiff,

while operating a forklift, sustained injuries when a forklift fork detached and fell on his foot),

and *Willis v. Wal-Mart Stores, Inc.*, 819 F. Supp. 2d 700 (M.D. Tenn. 2011) (a product liability

case where the plaintiff was injured when a deer stand bought from the defendant broke, causing

the plaintiff to fall).

All these cases share key characteristics with *Schultz*: the injuries were immediate and

apparent at the time of the incident; the causes of injuries were straightforward and easily, if not

immediately, identifiable; the liable parties could be determined without difficulty; and the

plaintiffs had no claim of fraudulent concealment. These facts are fundamentally different from

those in *Redwing*, *Foster*, and the present case. Unlike *Schultz* and the cases following it, this

case involves injuries caused by sexual abuse, a type of harm often concealed by secrecy and

manipulation. And the critical issue here is whether the Diocese and Sacred Heart had knowledge

or were put on notice of Wiggs's misconduct and failed to act. The facts here align more closely

with *Redwing* and *Foster*, where the discovery rule tolled the statute of limitations because of the

hidden or unknown nature of the defendants' wrongful conduct. Therefore, this Court should

apply the discovery rule as clarified and followed by the Tennessee Supreme Court in *Redwing* and *Foster*.

Applying *Redwing*, the statute of limitations should be tolled because Plaintiff could not have reasonably discovered his claims against Defendants until the October 17, 2023, article published in *The Commercial Appeal*. While Plaintiff knew that Wiggs was the one who sexually abused him and injured him, he did not know that Defendants' conduct was a cause of his injury. As detailed in the Complaint, it was not until the October 17, 2023, article published by *The Commercial Appeal* that Plaintiff could have understood who (besides Wiggs) had caused his injuries. It was not until the Article that Plaintiff had reason "to believe that there were other victims who had been abused by Wiggs and that each Defendant knew or should have known about Wiggs's abuse." (Compl. ¶ 102.) It was not until the Article that Plaintiff had reason to believe that Wiggs's abusive conduct had been reported to the Diocese of Memphis. (Compl. ¶ 38; Article, Defs.' Exhibit 1, p. 4 of 7.) It was not until the Article that Plaintiff had reason "to suspect that the Diocese and Sacred Heart entered a scheme of concealment and fraud with Wiggs." (Compl. ¶ 99.) Prior to the publication of the Article, "Plaintiff believed that the Diocese and Sacred Heart would not tolerate conduct that was immoral and illegal" and that "the Diocese would uphold their duties to act in Plaintiff's best interest and keep him safe." (*Id.*, ¶¶ 99-100.) Until the article was published, Plaintiff had no reasonable basis to suspect Defendants' role in his injury, making tolling of the limitations period appropriate under *Redwing*.

Defendants cited Plaintiff's statements as purported evidence that he "had sufficient facts or could have easily discovered in litigation that the Diocese would have knowledge that Wiggs was unfit for the job of pastor at Sacred Heart." (Defs.' Mem., ECF No. 12-1, at 12-13.) These

statements, however, do not support the conclusion that Plaintiff was on notice of Defendants'

knowledge of Wiggs's conduct or their negligent acts and omissions in facilitating the abuse.

First, Plaintiff's allegations reflect his beliefs as to the prolific nature of Wiggs's abuse,

not reasons to believe in the Diocese's awareness of Wiggs's unfitness. The statements cited by

Defendants—such as Plaintiff strongly suspecting that he was not the only victim—are

reflections, formed years after the abuse, that represent Plaintiff's interpretation of Wiggs's

conduct and do not give rise to any direct or reasonable inference that the Diocese or Sacred

Heart had knowledge of Wiggs's misconduct. Plaintiff's suspicions regarding other victims do

not equate to any suspicion that Defendants were aware or put on notice of Wiggs's actions or

unfitness as a pastor.

Second, the troubling behaviors described by Plaintiff—such as Wiggs surrounding

himself with boys, encouraging nudity, watching pornographic movies, and encouraging

masturbation—occurred in private or informal settings, such as during outings, at the racquetball

club, or during sleepovers at Wiggs's home. (Compl. ¶¶ 24-37.) These settings were outside

formal church oversight and inherently shielded Wiggs's conduct from public view or

institutional scrutiny. Plaintiff could not have reasonably assumed that the Diocese or Sacred

Heart had access to this information, as the misconduct was confined to Wiggs's personal

interactions with minors. Moreover, Wiggs's position as a trusted authority figure insulated him

from suspicion. As is common in abuse cases, individuals like Wiggs often operate under the

guise of legitimate pastoral or mentoring relationships, which further masks their misconduct.

The inherently private nature of the abuse made it difficult for Plaintiff, or anyone in his

situation, to believe that the Diocese or Sacred Heart would have knowledge of Wiggs's

behavior. This is particularly true given Plaintiff's allegations that Defendants "actively [took]

steps to protect Wiggs, conceal their own wrongdoing in supervising (or failing to supervise)

Wiggs, and prevent survivors of abuse by Wiggs from filing civil lawsuits." (Compl. ¶ 42).

Third, Plaintiff's experience reflects the unfortunate and well-documented reality of

abuse, where victims often remain silent for decades due to fear, shame, or manipulation.

Plaintiff himself did not share his story publicly until he was 56 years old, and it is reasonable to

infer that other victims also remained silent. In the absence of reports, allegations, or outward

signs of misconduct, Plaintiff could not have reasonably assumed that the Diocese or Sacred

Heart knew or should have known about Wiggs's actions or unfitness for his role.

Plaintiff's statements reflect personal suspicions and private observations as a victim of

abuse. They do not translate into an ability to easily discover that Defendants had knowledge of

Wiggs's history and propensity for committing sexual abuse against minors. The misconduct

Plaintiff described was inherently private, unreported, and shielded from institutional awareness.

Plaintiff's belief that others may have been abused by Wiggs, his eventual recognition of Wiggs's

behavior as inappropriate, and his knowledge that Wiggs was employed by Defendants do not

reasonably suggest that Plaintiff should have been on notice of Defendants' knowledge of

Wiggs's conduct or their negligent acts and omissions in facilitating his abuse.

In short, Plaintiff could not have known "the identity of the defendant[s] who breached

the duty" until October 17, 2023. *Redwing*, 363 S.W.3d at 459 (quoting *Foster*, 633 S.W.2d at

305). This case materially resembles *Redwing*. There, as here, the plaintiff "knew he was abused,

knew the identity of the abuser, and knew the abuser was an employee of the employer." *Id*. at

464. And there, as here, limitations do not bar the case. Given the circumstances, the statute of

limitations did not begin to run until October 17, 2023. Thus, Plaintiff's Complaint filed on

September 17, 2024, within a year from October 17, 2023, was filed timely under the discovery

rule.

> **B.**     **Defendant's affirmative acts fraudulently concealed Plaintiff's claims against them and tolled the limitations period.**

Defendants' own acts tolled the limitations period under the doctrine of fraudulent

concealment even if Plaintiff could otherwise reasonably have discovered his claims against

Defendants, which he could not. To prove fraudulent concealment, four elements must be

established:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by " 'withholding information or making use of some device to mislead' the plaintiff in order to exclude suspicion or prevent inquiry."

*Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 462-63 (2012) (internal

citations omitted).

The seminal case in Tennessee involving fraudulent concealment of clergy sexual abuse

is *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436 (2012). In *Redwing*, the

Supreme Court of Tennessee recognized several allegations, which were sufficient to permit the

lawsuit to proceed notwithstanding the statute of limitations:

> At the time that Mr. Redwing was abused by Father Guthrie, Mr. Redwing and/or his family were unaware of the Diocese's knowledge of Father Guthrie's sexual interest in young boys. In fact, Mr. Redwing and/or his family were misled by the Diocese with regard to the Diocese's knowledge of Father Guthrie's history and propensity for committing sexual abuse upon minors.

> After finding out about Father Guthrie's abuse of minors, the Diocese actively took steps to protect Father Guthrie, conceal the Diocese's own wrongdoing in supervising Father Guthrie, and prevent Norman Redwing and other victims of Father Guthrie from filing civil lawsuits.

*Redwing*, 363 S.W.3d at 465–66.

Similar allegations exist in Plaintiff's Complaint to warrant the tolling of the limitations period on the basis of fraudulent concealment. As the Complaint states, "At the time that Plaintiff was abused by Wiggs, Plaintiff and/or his family were unaware of the Diocese's knowledge of Wiggs's sexual interest in young boys. In fact, Plaintiff and/or his family were misled by the Diocese and Sacred Heart with regard to their knowledge of Wiggs's history and propensity for committing sexual abuse upon minors." (Compl. ¶ 41.) "After learning about Wiggs's abuse of minors, the Diocese and Sacred Heart actively took steps to protect Wiggs, conceal their own wrongdoing in supervising (or failing to supervise) Wiggs, and prevent survivors of abuse by Wiggs from filing civil lawsuits." (Compl. ¶ 42.)

These allegations in Plaintiff's Complaint, like those in *Redwing*, indicated that both the Dioceses and Sacred Heart "knew, but covered up," Wiggs's sexual abuse of minors and that they were aware that Wiggs sexually abused minors yet misled Plaintiff and his family about its knowledge and involvement. *See Redwing*, 363 S.W.3d at 466. As the Tennessee Supreme Court explained in *Redwing*, considered in the light most favorable to the plaintiff, those allegations "could amount to fraudulent concealment." *Id*.

Defendants argue that Plaintiff was put on inquiry notice as he knew he was abused, knew the abuser was Wiggs, and knew that Wiggs was an employee of Sacred Heart and the Diocese. This alone, however, is not sufficient to defeat a claim of fraudulent concealment, as clarified in *Redwing*.

In *Redwing*, the Supreme Court of Tennessee agreed with the lower court that Mr. Redwing "was on inquiry notice because he knew he was abused, knew the identity of the abuser, and knew the abuser was an employee of the employer." *Id*. at 464 (internal citation

omitted). Nonetheless, the *Redwing* Court departed from the majority of the lower court and adopted Judge Kirby's dissent, finding that dismissing Mr. Redwing's complaint for failing to exercise reasonable diligence was "premature." *Id*.

The courts "cannot… simply accept the Diocese's repeated conclusory assertion that [Plaintiff]'s knowledge of his abuse, the identity of his abuser, and the relationship between the abuser and the Diocese gave [Plaintiff] sufficient knowledge to put him on inquiry notice of a claim against the Dioceses." *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 728 (2008). Instead, it is "'necessary to examine in some detail what [Plaintiff] knew at the time he reached majority and follow the thread of what would have happened' had he pursued a claim against the Diocese or the priest." *Redwing v. Cath. Bishop for Diocese of Memphis*, 2010 WL 2106222, at *9 (Tenn. Ct. App. May 27, 2010) (Kirby, J., dissenting) (citing *Doe*, 306 S.W.3d at 728).

Following the thread of what would have occurred had Plaintiff pursued a claim against the Dioceses and Sacred Heart or the priest, it becomes clear that Plaintiff would not have discovered that he had a claim for negligent supervision, monitoring, retention, and training.

As alleged in the Complaint and indicated in the Article, the Diocese has demonstrated a persistent refusal to acknowledge such knowledge. For instance, even to this day, Defendants have denied having records of any credible reports against Wiggs. (Article, Defs' Exhibit 1, at 4 of 7.) It is even less likely that the Diocese or Sacred Heart would have voluntarily revealed any potentially incriminating information years ago, absent formal discovery procedures. Therefore, making inquiries to the Diocese or Sacred Heart in 1987 would not have enabled Plaintiff to uncover Defendants' knowledge of Wiggs's prior instances of child abuse.

Second, even if Plaintiff had filed a lawsuit against Wiggs himself, he still would not

have discovered a claim of negligent supervision, monitoring, retention, and training. A plaintiff

who seeks to recover against an employer for negligent supervision must show that the "harm

caused by the employee's action [was] foreseeable to the employer." *Redwing*, 2010 WL

2106222, at \*9 (Kirby, J., dissenting) (citing *Smith v. Keyport Self–Storage*, 2000 WL 558604, at

\*4 (Tenn.Ct.App. May 5, 2000)). "The plaintiff must show 'specific knowledge' of facts that

would put the employer on notice of the employee's wrongful acts." *Id*. (citing *Overland v.

Swifty Oil Co*., 2001 WL 856580, at \*4 (Tenn.Ct.App. July 31, 2001) *perm. app. den.* (Dec. 10,

2001)). At the time Plaintiff reached majority, he could not have reasonably been expected to

assert negligent supervision claims because he did not have even inquiry notice that Wiggs's

wrongful conduct was foreseeable by Defendants. *Id*.

Plaintiff's Complaint alleges that the Diocese and Sacred Heart misled him and his

family about their knowledge of Wiggs's history and propensity for committing sexual abuse

against minors (Compl. ¶ 41) and that they actively took steps to "protect Wiggs, conceal their

own wrongdoing in supervising (or failing to supervise) Wiggs, and prevent survivors of abuse

by Wiggs from filing civil lawsuits." (Compl. ¶ 42.) Plaintiff further alleges that it is the practice

of the Diocese in particular to "[m]aintain[] secret archives and files of evidence of sex abuse,

accessible only to the bishops," to "[i]nstruct[] Church officials in destruction of incriminating

documents," and to "[f]ail to disclose complaints to law enforcement officials, parishioners, and

the public." (Compl. ¶ 43.) The Diocese and Sacred Heart also made material misrepresentations

of facts, including that Wiggs was fit to serve as a minister to young people, that Wiggs was

appropriately trained, and that Defendants had no knowledge or reason to suspect Wiggs's

propensity for abuse—despite receiving multiple reports about Wiggs's conduct (Compl. ¶ 120;

*see generally* Article, Defs.' Exhibit 1). Presuming these allegations to be true, as the Court must at this stage, Defendants had fraudulently concealed their knowledge of Wiggs's history and propensity for committing sexual abuse upon minors, misleading Plaintiff and his into believing that the Diocese and Sacred Heart were not involved in or liable for Wiggs's misconduct.

Under such circumstances, even if Plaintiff pursued a claim against Wiggs when he reached majority, "there is substantial possibility that he would not have discovered that he had a claim of negligent supervision against the Diocese" and Sacred Heart. *Redwing*, 2010 WL 2106222, at *9 (Kirby, J., dissenting).

"For the purposes of both the discovery rule and the doctrine of fraudulent concealment, the pivotal issue is whether Mr. Redwing would have discovered the Diocese's allegedly wrongful acts had he exercised reasonable care and diligence." *Redwing*, 363 S.W.3d at 466. Whether Plaintiff exercised reasonable diligence to discover his claims against the Diocese "is a question of fact." *Id*. (citing *Sherrill v. Souder*, 325 S.W.3d at 596). At this stage of the proceedings, the facts are limited to the allegations in Plaintiff's Complaint, and the Court "must" "take the allegations… as true and draw all reasonable references in [Plaintiff]'s favor." *Id*.

Here, as in *Redwing*, Plaintiff has alleged that Defendants took affirmative steps to conceal their knowledge of Wiggs's activities and to mislead Plaintiff and his family. (Compl. ¶¶ 41-42.) Such allegations, "if proven, provide a basis for a reasonable fact-finder to conclude that [Plaintiff], lacking any basis for suspecting that the Diocese would deceive him, acted with reasonable diligence and, therefore, that he should not be held to have known that the Diocese's conduct caused him injury. They could also provide a basis for a reasonable fact-finder to

conclude that the Diocese fraudulently concealed its knowledge of and responsibility for

[Wiggs]'s conduct, thereby tolling the statute of limitations." *Id*. at 466-67.

Given the allegations in Plaintiff's Complaint and the procedural posture of this case,

dismissing Plaintiff's Complaint at this stage based on the running of the statute of limitations

would be premature.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion to

Dismiss be denied.


Dated: December 23, 2024                          Respectfully submitted,


                                                  */s/ John Spragens*
                                                  John Spragens, TN Bar No. 31445
                                                  Spragens Law PLC
                                                  311 22nd Avenue North
                                                  Nashville, TN 37203
                                                  Telephone: (615) 983-8900
                                                  Fax: (615) 682-8533
                                                  john@spragenslaw.com

                                                  Andrew S. Janet (pending *pro hac vice*)
                                                  JANET, JANET & SUGGS, LLC
                                                  Executive Centre at Hooks Lane
                                                  4 Reservoir Circle, Suite 200
                                                  Baltimore, MD 21208
                                                  Telephone: (410) 653-3200
                                                  Fax: (410) 653-9030
                                                  asjanet@jjsjustice.com